1
2
3
4
5
6          **UNITED STATES DISTRICT COURT**
7          **CENTRAL DISTRICT OF CALIFORNIA**
8
   AMBER WALLISA,                        )        Case No. ED CV 16-2638 FMO (KKx)
9                                        )
                  Plaintiff,             )
10                                       )
        v.                               )        **ORDER RE: DEFENDANTS' MOTION FOR**
11                                       )        **SUMMARY JUDGMENT**
   CITY OF HESPARIA, et al.,             )
12                                       )
                  Defendants.            )
13 _____ )

14          Having reviewed and considered all briefing filed with respect to the Motion for Summary

15 Judgment or, in the Alternative, Partial Summary Judgment (Dkt. 101, "Joint Br."), filed by

16 Jonathan Flores ("Flores"), Spencer Wilt ("Wilt"), Kent Watson ("Watson"), and the County of San

17 Bernardino ("County") (collectively, "defendants"), the court finds that oral argument is not

18 necessary to resolve the Motion, see Fed. R. Civ. P. 78; Local Rule 7-15; Willis v. Pac. Mar. Ass'n,

19 244 F.3d 675, 684 n. 2 (9th Cir. 2001), and concludes as follows.

20                                    **BACKGROUND**

21          Amber Wallisa ("Wallisa" or "plaintiff"), individually and as successor-in-interest to decedent

22 Stephen Schenck ("Schenck"), filed the instant action against defendants, asserting various

23 causes of action arising from an incident that led to Schenck's death.  (See Dkt. 1, Complaint at

24 ¶¶ 10-14).   Plaintiff filed her Second Amended Complaint (Dkt. 43, "SAC"), the operative

25 complaint, on December 22, 2017.   (See id.).   Pursuant to the parties' stipulation, plaintiff

26 dismissed several of her claims, (see Dkt. 100, Stipulation for Partial Dismissal; Dkt. 103, Court's

27 Order of August 30, 2018), such that the remaining claims are: (1) use of excessive force in

28 violation of the Fourth Amendment; (2) wrongful death in violation of the Fourth Amendment; (3)

violation of plaintiff's right to familial relationship in violation of the Fourteenth Amendment; (4) failure to render medical care in violation of the Fourteenth Amendment; (5) wrongful death/negligence in violation of California Code of Civil Procedure §§ 377.60 and 377.61; (6) violation of Schenk's right to enjoy civil rights in violation of the Bane Act, Cal. Civil Code § 52.1; (7) intentional infliction of emotional distress; (8) assault; and (9) battery. (See Dkt. 101, Joint Br. at 2-3).

## **STATEMENT OF FACTS**[1]

Shortly after 4:00 a.m. on January 25, 2016, San Bernardino County Sheriff's Department Deputies Flores, Wilt, and Watson (collectively, "officers") responded to a call regarding an unknown disturbance on 11th Avenue in Hesperia, California.  (See Dkt. 101-1, Statement of Uncontroverted Facts ("SUF") at D1; Dkt. 101-3, Joint Evidentiary Appendix ("JEA"), Exhibit ("Exh.") 1, Audio of Radio Dispatch, dated January 25, 2016 ("Dispatch"); Dkt. 101-4, Exh. 2, Call History Log Re: 8831 Eleventh Ave., dated January 25, 2016 ("Call Log"); Dkt. 101-5, Exh. 3, Deposition of Jonathan Flores ("Flores Depo.") at 74-76.  Dispatch advised the officers that a male suspect had forced his way into a residence ("11th Avenue Residence"), assaulted a resident with a bat, stolen a motorcycle, and had set a big rig on fire.  (Dkt. 101-3, Dispatch at 00:31-0:40; 2:07-2:12 & 4:15-4:19; see Dkt. 101-1, SUF at D2 & D4-D6; Dkt. 101-5, Flores Depo. at 76-79; Dkt. 101-6, Exh. 4, Deposition of Kent Watson ("Watson Depo.") at 19 & 41; Dkt. 101-7, Exh. 5, Deposition of Spencer Wilt ("Wilt Depo.") at 22-23 & 30-31).  Several officers responded to the call as a "Code 3[,]" with lights and sirens.  (Dkt. 101-1, SUF at D3; see Dkt. 101-5, Flores Depo. at 75-76 & 77-79; Dkt. 101-2, Watson Depo. at 19-22).

Around 4:23 a.m., Flores arrived at the 11th Avenue Residence and saw a woman in the driveway waving her arms yelling, "He's in the back[.]"  (Dkt. 101-1, SUF at D7; see Dkt. 101-4, Call Log at ECF 1932; Dkt. 101-5, Flores Depo. at 91; Dkt. 101-20, Exh. 18, Transcript of Jonathan Flores Statement to Homicide Detail ("Flores St.") at ECF 2306-07.  Flores walked past

---

[1]  The record is viewed in the light most favorable to plaintiff, the nonmovant.  See Vos v. City of Newport Beach, 892 F.3d 1024, 1028 (9th Cir. 2018).

1    the woman in the driveway and noticed a male near the front door of the 11th Avenue Residence,

2    (see Dkt. 101-1, SUF at D9-D10; Dkt. 101-5, Flores Depo. at 91), who had minor scratches and

3    a cut on one finger later treated by paramedics with band-aids.    (See Dkt. 101-9, Exh. 7,

4    Statement of Ben Mestas ("Mestas St."); Dkt. 101-10, Exh. 8, Statement of Craig Cummings

5    ("Cummings St.")).

6        Flores made his way to the backyard of the 11th Avenue Residence and saw an individual

7    – later identified as Schenck – wearing black clothing and running eastbound toward the back

8    fence.    (See Dkt. 101-1, SUF at D10-D12; Dkt. 101-3, Dispatch at 6:21; Dkt. 101-4, Call Log at

9    ECF 1932; Dkt. 101-5, Flores Depo. at 91 & 94).    Flores did not see a bat in Schenck's hands.

10    (See Dkt. 101-5, Flores Depo. at 98).    As Schenck continued toward the back fence of the 11th

11    Avenue Residence, Flores began to chase him.    (See Dkt. 101-1, SUF at D14-D15; Dkt. 101-5,

12    Flores Depo. at 96-97).    Schenck hopped over the fence onto the easement behind the 11th

13    Avenue Residence and neighboring houses, (see Dkt. 101-1, SUF at D15; Dkt. 101-5, Flores

14    Depo. at 96-97), then ran northbound through the easement and scaled a fence to another

15    backyard.    (See Dkt. 101-1, SUF at D17; Dkt. 101-3, Dispatch at 6:46-7:45; Dkt. 101-4, Call Log

16    at ECF 1932; Dkt. 101-5, Flores Depo. at 98-100).

17        Flores requested backup, (see Dkt. 101-1, SUF at D18; Dkt. 101-5, Flores Depo. at 101;

18    Dkt. 101-3, Dispatch at 10:30-10:42), and radioed for a perimeter to be set up to prevent Schenck

19    from fleeing the area.    (See Dkt. 101-1, SUF at D19; Dkt. 101-5, Flores Depo. at 102).    Around

20    4:29 a.m., Flores confirmed with Dispatch that there was no big rig on fire.    (See Dkt. 101-1, SUF

21    at P6; Dkt. 101-3, Dispatch at 9:33-9:39).    Flores then waited between five to ten minutes for

22    additional deputies to arrive.    (See Dkt. 101-1, SUF at D20; Dkt. 101-5, Flores Depo. at 105-06).

23        Wilt soon arrived, and he and Flores hopped over the fence to search for Schenck, (see

24    Dkt. 101-1, SUF at D19-D21; Dkt. 101-5, Flores Depo. at 105-07; Dkt. 101-7, Wilt Depo. at 31-32),

25    entering a backyard filled with debris and vehicles.    (See Dkt. 101-1, SUF at D22; Dkt. 101-5,

26    Flores Depo. at 108).    Flores found Schenck hiding face down, under a bus, and alerted Wilt to

27    Schenck's presence.    (See Dkt. 101-1, SUF at D23 & D27; Dkt. 101-3, Dispatch at 15:00; Dkt.

28    101-4, Call Log at ECF 1932; Dkt. 101-5, Flores Depo. at 109-11; Dkt. 101-7, Wilt Depo. at ECF

2058).  Although there was some light in the backyard, there was a carport blocking much of the light in the area where the bus was parked.  (See Dkt. 101-5, Flores Depo. at 110-11 & 114-15; Dkt. 101-6, Watson Depo. at 28).

Wilt stood at the front of the bus and Flores stood on the left side of the bus.  (See Dkt. 101-1, SUF at D32; Dkt. 101-5, Flores Depo. at 115; Dkt. 101-7, Wilt Depo. at 41).  Both officers drew their guns and began yelling conflicting commands at Schenck.  (See Dkt. 101-5, Flores Depo. at 111-12; Dkt. 101-8, Exh. 6, Audio of Radio Belt Recording from Spencer Wilt ("Wilt Audio") at 00:01; Dkt. 101-20, Flores St. at ECF 2308; 101-21, Exh. 19, Transcript of Spencer Wilt's Statement to Homicide Detail ("Wilt St.") at ECF 2325).  Wilt yelled, "You're gonna get shot if you don't show me your fucking hands!" (Dkt. 101-8, Wilt Audio at 0:01-0:03).  Immediately afterwards, Wilt yelled, "Crawl out now," followed shortly by Flores yelling, "let me see your hands[.]"  (Dkt. 101-8, Wilt Audio at 0:04; see Dkt. 101-7, Wilt Depo. at 35-36; Dkt. 101-20, Flores St. at ECF 2309).  One second later, Flores yelled, "Don't reach in your . . . , " and was interrupted by Wilt saying, "Fucking pop him!"  (Dkt. 101-1, SUF at P19; Dkt. 101-8, Wilt Audio at 0:07-0:08).  A few seconds later, Flores yelled, "You reach in your pocket and you're fucking dead!"  (Dkt. 101-1, P20; Dkt. 101-8, Wilt Audio at 0:10).  Schenck initially laid still and offered no response to the conflicting commands, (see Dkt. 101-5, Flores Depo. at 114; Dkt. 101-20, Flores St. at ECF 2309-10), but within about 15 seconds of being discovered under the bus, Schenck said, "Okay." (Dkt. 101-8, Wilt Audio at 0:15).

Very soon thereafter, Flores holstered his firearm, unholstered his taser, and pointed it at Schenck, who was still under the bus.  (See Dkt. 101-1, SUF at D43; Dkt. 101-5, Flores Depo. at 134; Dkt. 101-20, Flores St. at ECF 2308-09).  The officers and Schenck then had the following exchange:

Flores:  Show me your hands!  Come out!  Come out now or I'm tasing you!

Schenck:  I'm coming out! I'm coming out!

Flores:  Come out! Let me see your hands!

Wilt:  Fucking pop him!

Flores:  Come out or I'm gonna fucking tase you!  Let me see your hands!

4

(Dkt. 101-8, Wilt Audio at 00:24-00:35; Dkt. 101-1, SUF at P27).  Schenck showed his hands to Flores, said he was going to come out, and then started to crawl out.  (See Dkt. 101-20, Flores St. at ECF 2310).  As Schenk began to crawl out from underneath the bus on the side where Flores was standing, Flores told Wilt that Schenck was coming out on Flores's side of the bus. (See Dkt. 101-8, Wilt Audio at 0:43).  Wilt then walked around the back of the bus to assist Flores in taking Schenck into custody.  (See Dkt. 101-1, SUF at D35; Dkt. 101-5, Flores Depo. at 119; Dkt. 101-7, Wilt Depo. at 48).

Within seconds, as Schenck was in the process of crawling out from under the bus, Wilt struck him in the back three to four times with a closed fist, yelling, "Let me see your fucking hands!"  (See Dkt. 101-1, SUF at P30; Dkt. 101-7, Wilt Depo. at 56-57; see Dkt. 101-8, Wilt Audio at 0:50).  Schenck, who was lying flat on his stomach, yelled, "Ow, Ow!"  (See Dkt. 101-1, SUF at P31; Dkt. 101-7, Wilt Depo. at 51, 52, 56; Dkt. 101-8, Wilt Audio at 0:54; Dkt. 101-21, Wilt Tr. at ECF 2331).  Flores then placed his taser on Schenck's lower back and deployed it in drive-stun mode.[2]  (See Dkt. 101-1, SUF at D43; Dkt. 101-5, Flores Depo. at 134).  Although Wilt did not believe that Schenck was trying to hit or attack the officers, (Dkt. 101-21, Wilt St. at ECF 2327 & 2329; see Dkt. 101-7, Wilt Depo. at 58-60 & 63-64), he nonetheless delivered about 15 hammer strikes to Schenck's face and head.  (See Dkt 101-7, Wilt Depo. at 58-60; Dkt. 101-21,Wilt St. at ECF 2327; Dkt. 101-8, Wilt Audio at 0:54-1:10).

Meanwhile, Flores administered two more taser electrical shocks to Schenck's back.  (See Dkt. 101-5, Flores Depo. at 140 &146, Dkt. 101-8, Wilt Audio at 1:23).  Schenck cried out in pain after Flores placed the taser in his lower back pleading, "I'll show them to you!"  (See Dkt. 101-8, Wilt Audio at 1:22).  One of the officers yelled, "Don't fucking move, you understand?  Don't move! Stop moving!  Stop moving now!" as Schenck moaned and gasped for air.  (Id. at 1:36-1:45).

---

[2]  "When a taser is used in drive stun mode, the operator removes the dart cartridge and pushes two electrode contacts located on the front of the taser directly against the victim.  In this mode, the taser delivers an electric shock to the victim, but it does not cause an override of the victim's central nervous system as it does in dart-mode."  Mattos v. Agarano, 661 F.3d 433, 443 (9th Cir. 2011) (en banc), cert. denied, 566 U.S. 1021 (2012).

1    Around 4:37 a.m., while lying flat on his stomach, Schenck began to tell the officers that he
2    could not breathe.  (See Dkt. 101-8, Wilt Audio at 1:41; Dkt. 101-21, Wilt St. at ECF 2322).
3    Schenck grabbed Flores's leg, and Flores, fearing he would fall backwards, struck the left side of
4    Schenck's face with the butt of his taser.  (See Dkt. 101-1, SUF at D49; Dkt. 101-5, Flores Depo.
5    at 148; Dkt. 101-8, Wilt Audio at 1:45-1:47).   Meanwhile, Schenck, gasping, told the officers at
6    least 15 times – over the course of more than a minute – that he could not breathe.  (See Dkt.
7    101-8, Wilt Audio at 1:43-2:40).  Wilt then released some of the pressure off of Schenck's back.
8    (See Dkt. 101-21, Wilt St. at ECF 2322).  Watson arrived around this time, and saw Schenck lying
9    on his stomach, with Wilt resting one of his knees across Schenck's shoulders as Wilt and Flores
10   handcuffed Schenck.  (See Dkt. 101-1, SUF at P40 ; Dkt. 101-6, Watson Depo. at 21; Dkt. 101-8,
11   Wilt Audio at 1:40-1:45; Dkt. 101-21, Wilt Tr. at ECF 2322).

12   After Schenck was handcuffed, Wilt commanded him to "Roll onto [his] fucking butt now!"
13   and to "Stand the fuck up now."  (See Dkt. 101-1, SUF at P45-P46; Dkt. 101-6, Watson Depo. at
14   22; Dkt. 101-8, Wilt Audio at 2:42 & 2:47; Dkt. 101-21, Wilt St. at ECF 2322).  Schenck looked
15   dazed and struggled to get to his feet.  (See Dkt. 101-1, SUF at P48; Dkt. 101-21,Wilt St. at ECF
16   2322).  He began to moan, (see Dkt. 101-8,Wilt Audio at 2:50-3:00), and shortly after the officers
17   stood Schenck up, Watson, with one of his palms on the back of Schenck's head and the other
18   on Schenck's shoulders, shoved Schenck into the bus.  (See Dkt. 101-6, Watson Depo. at 25, 26,
19   28).  Immediately thereafter, he pushed Schenck into a post.  (See id. at 25-28 & 44-45).

20   For the next few minutes, the officers attempted to force Schenck to walk from the bus to
21   the patrol vehicle, commanding him to "Walk, mother fucker!" "Get up bitch!" and "Get on your
22   fucking feet now!" (Dkt. 101-1, SUF at P52-P55; Dkt. 101-8, Wilt Audio at 3:38, 4:12, 4:30, 4:46).
23   Schenck's moans escalated into gasping cries.  (See Dkt. 101-8, Wilt Audio, 3:15-3:22, 3:39-3:50,
24   4:09-4:15; 4:46-4:48).  As the officers attempted to force Schenck to walk, he collapsed three
25   times, once going deadweight on the officers' shoulders, once bending at the waist, and finally
26   collapsing to the ground.  (See Dkt. 101-8, Wilt Audio at 3:00-5:25; Dkt. 101-21, Wilt St. at ECF
27   2323;  Dkt. 101-20, Flores St. at ECF 2317-19; Dkt. 101-6, Watson Depo. at 35-36 & 45).

28

1    After Schenck collapsed the third time, the officers carried him the rest of the way to the

2    patrol car.  (See Dkt. 101-6, Watson Depo. at 38; Dkt. 101-7, Wilt Depo. at 88; Dkt. 101-20, Flores

3    St. at 2318-19).  They placed him in a seated position, and around 4:42 a.m., Wilt called for

4    medical assistance.  (See Dkt. 101-1, SUF at D81-D82; Dkt. 101-3, Dispatch at 16:40; Dkt. 101-4,

5    Call Log at ECF 1932; Dkt. 101-7, Wilt Depo. at 88 & 106; Dkt. 101-8, Wilt Audio at 5:24; Dkt. 101-

6    6, Watson Depo. at 50).  When the paramedics arrived on the scene a few minutes later, Schenck

7    was unresponsive.  (See Dkt. 101-1, SUF at D84; Dkt. 101-9, Mestas St.; Dkt. 101-10, Cummings

8    St.).  He was pronounced dead at the hospital less than an hour later.[3]  (See Dkt. 101-4, Call Log

9    at ECF 1933; Dkt. 101-9, Mestas St.; Dkt. 101-10, Cummings St.; Dkt. 101-18, Spitz Depo. at 56;

10   Dkt. 101-17, Exh. 15, "Autopsy Report" at ECF 2254 (noting that Schenck "died in custody")).

11                                    **LEGAL STANDARD**

12   Rule 56(a) of the Federal Rules of Civil Procedure authorizes the granting of summary

13   judgment "if the movant shows that there is no genuine dispute as to any material fact and the

14   movant is entitled to judgment as a matter of law."  The standard for granting a motion for

15   summary judgment is essentially the same as for granting a directed verdict.  See Anderson v.

16   Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986).  Judgment must be entered

17   "if, under the governing law, there can be but one reasonable conclusion as to the verdict."  Id.

18   The moving party has the initial burden of identifying relevant portions of the record that

19   demonstrate the absence of a fact or facts necessary for one or more essential elements of each

20   cause of action upon which the moving party seeks judgment.  See Celotex Corp. v. Catrett, 477

21   U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986) ("Celotex").  If the moving party fails to carry its initial

22   burden of production, "the nonmoving party has no obligation to produce anything."  Nissan Fire

23   & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102-03 (9th Cir. 2000) ("Nissan Fire").

24   If the moving party has sustained its burden, the burden then shifts to the nonmovant to

25   identify specific facts, drawn from materials in the file, that demonstrate that there is a dispute as

26   _____

27      [3]  According to plaintiff, Schenck died before arriving at the hospital, while still restrained.  (See
     Dkt. 101-1, SUF at D85; Dkt. 101-9, Mestas St.; Dkt. 101-10, Cummings St.; Dkt. 101-18, Exh. 16,
28   Deposition Testimony of Werner Spitz, M.D. ("Spitz Depo.") at 56).

to material facts on the elements that the moving party has contested.  See Celotex, 477 U.S. at 324, 106 S.Ct. at 2553; Anderson, 477 U.S. at 256, 106 S.Ct. at 2514 (holding that a party opposing a properly supported motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial.").[4]  A factual dispute is material only if it affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth.  SEC v. Seaboard Corp., 677 F.2d 1301, 1306 (9th Cir. 1982).  Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322, 106 S.Ct. at 2552; see Anderson, 477 U.S. at 252, 106 S.Ct. at 2512 (parties bear the same substantive burden of proof as would apply at a trial on the merits).

In determining whether a triable issue of material fact exists, the evidence must be considered in the light most favorable to the nonmoving party.  See Barlow v. Ground, 943 F.2d 1132, 1134 (9th Cir. 1991), cert. denied, 505 U.S. 1206 (1992).  However, summary judgment cannot be avoided by relying solely on "conclusory allegations [in] an affidavit."  Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188 (1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986) (more than a "metaphysical doubt" is required to establish a genuine issue of material fact).  "The mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to survive summary judgment; "there must be evidence on which the [fact finder] could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252, 106 S.Ct. at 2512.

---

[4]  "In determining any motion for summary judgment or partial summary judgment, the Court may assume that the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy except to the extent that such material facts are (a) included in the 'Statement of Genuine Disputes' and (b) controverted by declaration or other written evidence filed in opposition to the motion."  L.R. 56-3.

**DISCUSSION**

I.     FEDERAL CLAIMS.

   A.     Excessive Force.

   Defendants seek summary judgment on plaintiff's excessive force claim on the basis of qualified immunity. (See Dkt. 101, Joint Br. at 20-37 & 40-43). According to defendants, "[g]iven the information available to the deputies, coupled with the actions of Schenck, the deputies['] use of force under the totality of the circumstances was objectively reasonable under Graham." (Dkt. 101, Joint Br. at 25).

   "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 815 (2009) (internal quotation marks omitted). "[I]t protects all but the plainly incompetent or those who knowingly violate the law." Ashcroft v. al-Kidd, 563 U.S. 731, 743, 131 S.Ct. 2704, 2085 (2011) ("al-Kidd") (internal quotation marks omitted).

   The qualified immunity analysis involves two distinct steps, determining: (1) whether the facts alleged by a plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was "clearly established" at the time of a defendant's alleged misconduct. Pearson, 555 U.S. at 232, 129 S.Ct. at 816; see Sandoval v. Las Vegas Metro. Police Dep't, 756 F.3d 1154, 1160 (9th Cir. 2014), cert. denied, 135 S.Ct. 1401 (2015). Both prongs entail questions of law that the court may address in either order. See Pearson, 555 U.S. at 236, 129 S.Ct. at 818.

   "The Fourth Amendment, which protects against excessive force in the course of an arrest, requires that we examine the objective reasonableness of a particular use of force to determine whether it was indeed excessive." Gravelet-Blondin v. Shelton, 728 F.3d 1086, 1090 (9th Cir. 2013), cert. denied, 571 U.S. 1199 (2014). To determine whether the force used was reasonable, the court balances "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 1871 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances

9

that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Id. at 396-97, 109 S.Ct. 1872; see Fisher v. City of San Jose, 558 F.3d 1069, 1081 (9th Cir. 2009) (en banc).  Therefore, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Graham, 490 U.S. at 396, 109 S.Ct. at 1872.

"Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly."  Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir.) (en banc), cert. denied, 545 U.S. 1128 (2005) (first alteration in original); see Glenn v. Wash. Cty., 673 F.3d 864, 871 (9th Cir. 2011).  "This principle applies with particular force where," as here, "the only witness other than the officers was killed during the encounter."  Gonzalez v. City of Anaheim, 747 F.3d 789, 795 (9th Cir.) (en banc), cert. denied, 135 S.Ct. 676 (2014).  "In such cases, we must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story . . . is unable to testify."  Id. (internal quotation marks omitted).  "Accordingly, we carefully examine all evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence . . . to determine whether the officer's story is internally inconsistent with other known facts."  Id. (internal quotation marks omitted); see, e.g., Cruz v. City of Anaheim, 765 F.3d 1076, 1079-80 (9th Cir. 2014) (fact that no gun was found on decedent cast doubt on officers' account that decedent reached for waistband such that "jury could . . . reasonably conclude that the officers lied") (internal quotation marks omitted).

       1.    **Nature of the Intrusion**.

The court must "first assess the quantum of force used" against Schenk.  Davis v. City of Las Vegas, 478 F.3d 1048, 1054 (9th Cir. 2007).  As an initial matter, there is a genuine issue of material fact as to whether the force used against Schenk caused or otherwise contributed to his death.  (See Dkt. 101, Joint Br. at 35-40); Smith, 394 F.3d at 704-05 ("As we are reviewing an order of summary judgment, all that we must decide is whether the [amount of force used] to subdue Smith could have amounted to deadly force under the facts of this case.").  Here, viewing

the evidence in the light most favorable to plaintiff – although there appears to be no factual dispute as to the type and amount of force inflicted on Schenck – a jury could conclude that the force used by defendants caused or was a substantial factor in Schenck's death.  For example, there is no dispute that the officers struck Schenck's head and face about 15 times with closed fists and once with the butt of a taser.  (See Dkt. 101-1, SUF at D49; Dkt. 101-5, Flores Depo. at 148).  Striking a person's head can create "a substantial risk of death or serious bodily injury." Bryan v. MacPherson, 630 F.3d 805, 825 n. 6 (9th Cir. 2010) (defining lethal force as force that creates such a risk);  see Young v. Cty. of Los Angeles, 655 F.3d 1156, 1162 (9th Cir. 2011) (noting that Los Angeles County Sheriff's Department policies instruct officers that "[h]ead strikes with an impact weapon are prohibited unless circumstances justify the use of deadly force"); Garlick v. Cty. of Kern, 167 F.Supp.3d 1117, 1147 (E.D. Cal. 2016) (stating that "[b]aton blows to the head . . . are recognized as deadly force" and "[p]unching or kicking . . . could in some circumstances be employed in a manner that creates a substantial risk of death or serious bodily injury").  There is also no dispute that the officers used multiple closed fist strikes and a taser in drive-stun mode on Schenck's back multiple times, (see Dkt. 101-1, SUF at D43, D46, P30, & P36); that one or both officers placed his knee on top of Schenck when Schenck was lying on his stomach in a prone position, (see Dkt. 101-1, SUF at P40; Dkt. 101-6, Watson Depo. at 21); and that Watson pushed an already-handcuffed Schenck into the bus and a post.  (See Dkt. 101-6, Watson Depo. at 25-28 & 44-45).

Further, the Autopsy Report ("Report") prepared by Dr. Scott McCormick[5] ("Dr. McCormick"), in addition to identifying "acute methamphetamine intoxication" as the "cause of death," noted "other significant conditions," including "multiple blunt impact injuries, contact application of conducted energy device, and hypertensive cardiovascular disease." (Dkt. 101-17, Autopsy Report at ECF 2244).  The Report noted a diffuse hemorrhage in Schenck's left eye, consistent with blunt impact injury, and 23 other blunt impact injuries to the extremities of

_____

[5] The court denied defendants' motion in limine to exclude Dr. McCormick's testimony relating to the contribution of blunt force trauma and taser electricity to Schenck's cause of death.  (See Dkt. 134, Court's Order of December 12, 2018, at ¶ 3).

11

Schenck's body.  (See Dkt. 101-1, SUF at D89; Dkt. 101-11, McCormick Depo. at 52; Dkt. 101-17, Autopsy Report at ECF 2245).  According to Dr. McCormick, the combined pain associated with these injuries contributed to Schenck's cause of death.  (See Dkt. 101-1, SUF at P60; Dkt. 101-11, McCormick Depo. at 57-59,  66-69, 75, 79, 81-86, 90-94 & 137-38 ("McCormick Discussion of Cause of Death"); Dkt. 101-17, Autopsy Report at ECF 2245-48; Dkt. 101-18, Spitz Depo. at 49-50, 77, 104-05, 111 ("Spitz Discussion of Cause of Death")).

Dr. Werner Spitz ("Dr. Spitz"), plaintiff's forensic pathologist, opined that blunt force trauma and multiple taser deployments were significant factors in causing Schenck's death.  (See Dkt. 101-18, Spitz Depo. at Spitz Discussion of Cause of Death).  In addition, Dr. Spitz opined that the pressure the officers placed on Schenck's back while he lay in a prone position on his stomach not only caused pain, but interfered with his ability to breathe.  (See id.).  Dr. Spitz found evidence of the flattening of Schenck's brain, which he believed was the result of the brain swelling from oxygen hunger.  (See id. at 107-10).  Finally, with respect to the amount of methamphetamine in Schenk's body, Dr. Spitz noted that, although a 2.0 milligram per liter dose of methamphetamine was, in one documented case, determined to be the cause of death, he was skeptical that that amount is universally fatal and, in any event, the amount of methamphetamine in Schenck's system was below that amount.[6]  (See id. at 88-90).

"The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a 'fundamental interest in his own life' and because such force 'frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment.'" A.K.H. ex rel. Landeros v. City of Tustin, 837 F.3d 1005, 1011 (9th Cir. 2016) (quoting Tennessee v. Garner, 471 U.S. 1, 9, 105 S.Ct. 1694, 1700 (1985)).  Here, viewing the evidence in the light most favorable to plaintiff, a jury could find that defendants essentially beat Schenk to death, i.e., defendants used the highest level of force possible against Schenck.  See Garner, 471 U.S. at 9, 105 S.Ct. at 1700 ("The intrusiveness of a seizure by means of deadly force is unmatched.").  Thus, the court turns to the question of whether the governmental interests at stake were sufficient

---

[6]  Dr. McCormick's report indicated that Schenk had 1.69 milligrams/liter of methamphetamine in his system.  (See Dkt. 101-1, SUF at D102; Dkt. 101-11, McCormick Tr. at 103).

to justify the force used against Schenck.  See A.K.H. ex rel. Landeros, 837 F.3d at 1011 ("Deadly force is permissible only if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm.") (internal quotation marks omitted).

2.   **Governmental Interests**.

The strength of the government's interest is measured by examining three primary factors: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396, 109 S.Ct. at 1872; see Gravelet-Blondin, 728 F.3d at 1091.  "These factors, however, are not exclusive.  Rather, [the court] examine[s] the totality of the circumstances and consider[s] whatever specific factors may be appropriate in a particular case, whether or not listed in Graham." Bryan, 630 F.3d at 826.

First, with respect to the severity of the crime, the officers were responding to a report of an assault with a bat, a motorcycle theft, and a big rig on fire.  (See Dkt. 101-1, SUF at D2 & D4-D6; Dkt. 101-3, Dispatch at 00:31-0:40; 2:07-2:12 & 4:15-4:19; Dkt. 101-5, Flores Depo. at 76-79; Dkt. 101-6, Watson Depo. at 19 & 41; Dkt. 101-7, Wilt Depo. at 22-23 & 30-31).  However, when the officers arrived on the scene, they saw a man with only minor injuries – a cut on one finger, later tended to by paramedics with band-aids – who clearly had not been beaten with a bat. (See Dkt. 101-1, SUF at D9-D10; Dkt. 101-5, Flores Depo. at 91; Dkt. 101-9, Mestas St.; Dkt. 101-10, Cummings St.).  Moreover, the officers did not see anyone with a bat, and Flores testified that Schenck did not appear to have one.  (See Dkt. 101-5, Flores Depo. at 97-98).  Finally, there was no big rig on fire, which Flores confirmed with Dispatch within a few minutes of arriving on the scene.  (See Dkt. 101-1, SUF at P6; Dkt. 101-3, Dispatch at 9:33-9:39).  In short, viewing the evidence in the light most favorable to plaintiff, a reasonable jury could conclude that there was no reasonable basis to believe that "a crime involving the infliction or threatened infliction of serious physical harm" had occurred.  Garner, 471 U.S. at 11, 105 S.Ct. at 1701.

The second factor, the "most important" factor under Graham, is whether the suspect posed an "immediate threat to the safety of the officers or others."  Bryan, 630 F.3d at 826 (internal

13

quotation marks omitted).  "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."  Garner, 471 U.S. at 11, 105 S.Ct. at 1701.  In considering "whether there was an immediate threat, a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern."  Mattos, 661 F.3d at 441-42 (internal quotation marks omitted); see Deorle v. Rutherford, 272 F.3d 1272, 1281 (9th Cir. 2001), cert. denied, 536 U.S. 958 (2002) (same).

Here, viewing the evidence in the light most favorable to plaintiff, a reasonable jury could conclude that Schenck was not an immediate threat to the officers or others.  When the officers arrived on the scene, it became immediately apparent that no one had been assaulted with a bat and, more importantly, no officer saw Schenck with a bat.  (See Dkt. 101-1, SUF at D9-D10; Dkt. 101-5, Flores Depo. at 91 & 97-98; Dkt. 101-9, Mestas St.; Dkt. 101-10, Cummings St.).  Further, Flores had, prior to finding Schenck under the bus, radioed for a perimeter to be set up to prevent Schenck from fleeing the area.  (See Dkt. 101-1, SUF at D19; Dkt. 101-5, Flores Depo. at 102).  Once the officers found Schenk hiding under the bus, there was virtually no opportunity for Schenk to flee, as the bus was surrounded by Flores and Wilt, and other officers were on the way to assist them.  See Longoria v. Pinal Cty., 873 F.3d 699, 705 (9th Cir. 2017), cert. denied, 138 S.Ct. 2601 (2018) (focusing, among other things, on the fact the suspect was "surrounded by armed officers" in finding a genuine factual dispute as to whether officers used excessive force); Vos, 892 F.3d at 1033 (finding that suspect who was brandishing pair of scissors and behaving erratically was not imminent threat when, among other things, the officers had surrounded front door of 7-Eleven store where suspect was located).  Also, there is no evidence that there were any other people besides Schenck and the officers in the vicinity of the bus.  (See, generally, Dkt. 101-3, JEA).  In short, the fact that Schenck was lying face down on his stomach under a bus undermines any notion that Schenck was an immediate threat to defendants or others, particularly given the undisputed fact that none of the officers saw Schenck with a bat or, for that matter, any weapon.  (See Dkt. 101-5, Flores Depo. at 98).

14

1    In addition, defendants' testimony is the only evidence that Schenck allegedly reached

2    toward his waistband and that Schenck was actively resisting the officers.  (See Dkt. 101-5, Flores

3    Depo. at 111 & 150; Dkt. 101-7, Wilt Depo. at 26, 57-58 & 60).  However, in cases such as this,

4    in which the officer defendants are the only surviving eyewitnesses, "the court may not simply

5    accept what may be a self-serving account by the police officer[s]."  Scott v. Henrich, 39 F.3d 912,

6    915 (9th Cir. 1994), cert. denied, 515 U.S. 1159 (1995); see Cruz, 765 F.3d at 1079 (same).

7    Rather, the court "must carefully examine all the evidence in the record[,]" including "circumstantial

8    evidence that, if believed, would tend to discredit the police officer's story[,]" "to determine whether

9    the officer's story is internally consistent and consistent with other known facts."  Scott, 39 F.3d

10   at 915; see Cruz, 765 F.3d at 1079 (same).

11       Here, there is "circumstantial evidence that could give a reasonable jury pause" as to the

12   officers' accounts.  Cruz, 765 F.3d at 1079.  For example, Wilt stated that he "[doesn't think

13   [Schenck] ever really tucked his hand under his body[;]" and that, during the incident, he did not

14   believe Schenck was trying to hit or attack the officers.  (Dkt. 101-7, Wilt Depo. at 58-60 & 61-62;

15   see Dkt. 101-21, Wilt St. at ECF 2327 ("[H]e wasn't necessarily trying to hit us . . ., he just wasn't

16   complying . . . , I tried grabbing his arms several times and placing tried to place him in the small

17   of his back and he was just pulling away from us, . . . that's when we you know started um striking

18   him with a bottom fist.")).  Wilt's testimony coupled with evidence that Schenck apparently

19   attempted to comply with the officers' conflicting commands by showing them his hands and

20   crawling out from under the bus undermines the plausibility of the officers' claim that Schenck was

21   reaching for his waistband.  (See Dkt. 101-8, Wilt Audio at 00:24-00:35 (Schenck responding to

22   officers' commands by saying he will show his hands) & 1:22 (Schenck saying "I'll show them to

23   you!" in response to commands that he show his hands, after he had crawled out from under the

24   bus); Dkt. 101-20, Flores St. at ECF 2310 (explaining that Schenck showed his hands to Flores,

25   said he was going to come out, and then started to crawl out)).  In short, viewing the evidence and

26   circumstances in the light most favorable to plaintiff, a reasonable jury could conclude that

27   Schenck did not pose an immediate threat to the officers or others.  See Garner, 471 U.S. at 11,

28   105 S.Ct. at 1701.

Second, no weapon was found on Schenck, which could cause a reasonable jury to question the officers' account of the incident.  As the Ninth Circuit explained in Cruz, a case in which it reversed summary judgment for defendants on an excessive force claim stemming from a situation in which the plaintiff was killed during the encounter with police:

> Cruz didn't have a gun on him, so why would he have reached for his waistband?  Cruz probably saw that he was surrounded by officers with guns drawn.  In that circumstance, it would have been foolish – but not wholly implausible – for him to have tried to fast-draw his weapon in an attempt to shoot his way out.  But for him to make such a gesture when no gun is there makes no sense whatsoever.  A jury may doubt that Cruz did this.  Of course, a jury could reach the opposite conclusion.  It might believe that Cruz thought he had the gun there, or maybe he had a death wish, or perhaps his pants were falling down at the worst possible moment.  But the jury could also reasonably conclude that the officers lied.

Cruz, 765 F.3d at 1079-80.  The court also noted that "[a] jury might find implausible [that] four of the officers said they saw Cruz reach for his waistband.  A jury might be skeptical that four pairs of eyes had a line of sight to Cruz's hand[.]"  Id. at 1080.

Here, even assuming Schenck had a weapon such as a gun (instead of the alleged bat that no one saw), "it would have been foolish . . . for [Schenck] to have tried to fast-draw his weapon in an attempt to shoot his way out."  Cruz, 753 F.3d at 1079.   Similarly, a reasonable jury could conclude that it was implausible that two pairs of eyes had a line of sight to Schenck's hand in a dimly lit backyard in the dark of night while he was lying face down underneath a bus.  Viewing the evidence in the light most favorable to plaintiff, a reasonable jury could find that "there was no indication that [Schenck] intended to harm the officers or that he was armed[.]"  Mattos, 661 F.3d at 451; see Cruz, 765 F.3d at 1079-80 (same).

Moreover, there is an issue of material fact as to whether Schenck was actively resisting arrest.  (Compare Dkt. 101-1, SUF at P21, P22-25, P28, P32, P34 & P37-P38; Dkt. 101-21, Wilt St. at ECF 2327; with Dkt. 101-1, SUF at D46 & D50-D52; Dkt. 101-5, Flores Depo. at 140, 146,

149-50; Dkt. 101-7, Wilt Depo. at 56-58, 60, 70-71); see Rascon v. Brookins, 2018 WL 783675, *8 (D. Ariz. 2018) ("[A]n officer's 'provocative conduct' can trigger an individual's 'limited right to offer reasonable resistance,'" thus reducing the reasonableness of force used in response to such resistance.") (quoting Young, 655 F.3d at 1164). Indeed, the only resistance any of the officers testified to was "a failure to comply with [their] orders[.]" (See, e.g., Dkt. 101-21, Wilt St. at ECF 2327). However, viewing the evidence in the light most favorable to plaintiff, a reasonable jury could conclude that by showing his hands and crawling out from underneath the bus, Schenck was attempting to comply with, rather than actively resisting, the officers' commands. See, e.g., Bryan, 630 F.3d at 830 (stating, where "[t]he only resistance Officer MacPherson testified to was a failure to comply with his order[,]" that fact "militate[d] against finding Officer MacPherson's use of force reasonable"). In addition, a jury could find that any failure to comply with the officers' commands was due to the conflicting nature of the commands and the officers' failure to give Schenck enough time to comply with their commands. (See, e.g., Dkt. 101-1, SUF at P17-P20; Dkt. 101-7, Wilt Depo. at 35-36; Dkt. 101-8, Wilt Audio at 0:01-0:10; Dkt. 101-20, Flores St. at ECF 2308-09) (Wilt yelling, "You're gonna get shot if you don't show me your fucking hands!" while Flores yelled, "Come out now!"); Dkt. 101-1, SUF at P19; Dkt. 101-8, Wilt Audio at 0:08 (Flores yelling, "Don't reach in your . . ., " and being interrupted by Wilt stating, "Fucking pop him."); Dkt. 101-1, SUF at P17 & P24-P27; Dkt. 101-8, Wilt Audio at 00:24-00:35 (Flores: " Show me your hands!  Come out! Come out now or I'm tasing you!" Schenck: "I'm coming out! I'm coming out!" Flores: "Come out! Let me see your hands!" Wilt:  Fucking pop him!" Flores: "Come out or I'm gonna fucking tase you! Let me see your hands!")).

In any event, a jury could find that any resistance by Schenck "was not 'particularly bellicose'" and was insufficient to justify the amount of force used against Schenck. See Smith, 394 F.3d at 703-04 (finding that although Smith was not completely passive in encounter with police, it did not appear his "resistance was particularly bellicose" and thus a jury could conclude that the "totality of force" used against the suspect was unreasonable); Bryan, 630 F.3d at 830 (noting that while "passive resistance" can support the use of force, "the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance").

"Indeed, when we view the facts in the light most favorable to [Schenck], as we must at this stage of the proceedings, his conduct does not constitute resistance at all." Bryan, 630 F.3d at 830.

Finally, the court considers "additional 'specific factors' relevant to the totality of these circumstances." Mattos, 661 F.3d at 450 (quoting Bryan, 630 F.3d at 826); see Vos, 892 F.3d at 1033-34 ("Other relevant factors include the availability of less intrusive force, whether proper warnings were given and whether it should have been apparent to the officers that the subject of the force used was mentally disturbed."). One such "specific factor" is whether the officers gave appropriate warnings before employing the force. See Bryan, 630 F.3d at 831; Deorle, 272 F.3d at 1272. "Appropriate warnings . . . should be given, when feasible, if the use of force may result in serious injury." Glenn, 673 F.3d at 864 (internal quotation marks omitted).

Viewing the evidence in the light most favorable to plaintiff, a jury could find that the officers did not give appropriate warnings, given the conflicting commands and threats that were shouted at Schenck. For example, while Wilt yelled "You're gonna get shot if you don't show me your fucking hands now!," Flores yelled "Come out now!" (Dkt. 101-8, Wilt Audio at 0:01-0:10 (Wilt: "You're gonna get shot if you don't show me your fucking hands now!" Flores: "Come out now!"). In addition, immediately after yelling, "Show me your hands!" – and while Wilt was yelling, "Fucking pop him!" – Flores yelled, "Come out! Come out now or I'm tasing you!" which was followed by conflicting orders to "Come out or I'm gonna fucking tase you! Let me see your hands!" (Id. at 0:24-0:30). Defendants' commands were inconsistent and at times unintelligible, i.e., they were insufficient and otherwise improper. See, e.g., Thompson v. Rahr, 885 F.3d 582, 595 (9th Cir.), cert. denied, 139 S.Ct. 381 (2018) (giving, as example of "inconsistent commands," "Put your hands up! Don't move!") (internal quotation marks omitted); Glenn, 673 F.3d at 876 (reversing summary judgment in part because it was unclear whether decedent heard or understood officers' warnings to "drop the fucking knife or I'm going to kill you" because multiple people were yelling simultaneously, and "[c]onfusion regarding whether his life was in immediate danger may have led [decedent] to seek cover rather than surrender"); Napier by & through Quiroz v. San Diego Cty., 2017 WL 3020956, *6 (S.D. Cal. 2017) ("[T]here is evidence that proper warnings were not given, in that there were slightly conflicting warnings given at the same time" and this conflict

"could account for Napier's hesitation in response to [the officers'] commands."); see also Biscotti v. Yuba City, 636 F.Appx. 419, 422 (9th Cir. 2016) (reversing summary judgment grant for defendants, concluding there was triable issue as to whether officers' use of deadly force was reasonable under California negligence law, where "several [officers] shouted imperceptible orders").   In addition, any warnings that could have been understood during the melee of conflicting shouts were conditional ones: if Schenck did not show his hands, he would get shot, and if he did not come out from under the bus, he would be shot or tased.   In other words, to avoid being shot, Schenck would have to show his hands, and to avoid being tased, he would have to come out from under the bus.   Viewing the evidence in the light most favorable to plaintiff, a jury could find that Schenck heeded defendants' commands – he showed his hands, and came out from under the bus – but was still tased in spite of his compliance with defendants' orders.   (See Dkt. 101-8, Wilt Audio at 00:24-00:46; Dkt. 101-20, Flores St. at ECF 2310).   In other words, defendants' "commands" or "warnings" were false.   False warnings, or warnings by which the officers themselves do not abide, can hardly be considered "proper warnings."   See, e.g., A.K.H. ex rel. Landeros, 837 F.3d at 1009 & 1012-13 (use of excessive force violated decedent's Fourth Amendment right when, among other things, officer warned decedent, "Get your hand out of your pocket[,]" and although decedent complied with officer's command, and officer did not see anything in decedent's hand, officer shot and killed decedent).

    Another factor relevant to the totality of circumstances is "[w]hat other tactics if any were available to effect the arrest."   Bryan, 630 F.3d at 831 (internal quotation marks omitted, alteration in original).   Here, viewing the facts in the light most favorable to plaintiff, "there were clear, reasonable, and less intrusive alternatives" to punching Schenck in the head and back over a dozen times, hitting him in the head with the butt of a taser, tasing him in the back three times in short succession, applying body compression on him, and slamming him into a bus and a post after he was handcuffed.   Id.   As noted earlier, Flores had set up a perimeter to prevent Schenck from leaving the area, and Schenck was under a bus surrounded by Flores and Wilt.   (See Dkt. 101-1, SUF at D19; Dkt. 101-5, Flores Depo. at 102 & 111-12; Dkt. 101-8, Wilt Audio at 00:01; Dkt. 101-20, Flores St. at ECF 2308; Dkt. 101-21, Wilt St. at ECF 2325).   Also, Flores "knew

additional officers were en route to the scene." Bryan, 630 F.3d at 831; (see Dkt. 101-1, SUF at D18; Dkt. 101-5, Flores Depo. at 101; Dkt. 101-3, Dispatch at 10:30-10:42).  He "was, or should have been, aware that the arrival of those officers would change the tactical calculus confronting him, likely opening up additional ways to resolve the situation without the need for an intermediate level of force." Bryan, 630 F.3d at 831.  Moreover, even assuming defendants believed they had to use some level of force, there was at least one obvious alternative to the course of action defendants chose to pursue:  deploy the taser once in drive-stun mode and give Schenck time "to recover from the extreme pain [he] experienced, gather [himself], and reconsider [any alleged] refusal to comply." Mattos, 651 F.3d at 445.  "Even an additional fraction of a second affords suspects a greater opportunity to get their bearings and comply with commands, and officers the chance to reconsider the use of lethal force." Thompson, 885 F.3d at 596.  Here, the "[t]hree tasings in such rapid succession provided no time for [Schenck] to recover from the extreme pain [he] experienced, gather [him]self, and reconsider [his] refusal to comply." Id.  In other words, there were "other tactics available to effect the arrest." Bryan, 630 F.3d at 832 (internal quotation marks omitted).

In short, viewing the facts in the light most favorable to plaintiff, the high level of force employed by the officers "was excessive in light of the governmental interests at stake." Bryan, 630 F.3d at 832.  Here, a reasonable jury could find that what the officers observed when they arrived on the scene undermined the description of the crime relayed to them by Dispatch, as there was no big rig on fire and the only person injured had minor injuries later treated with band-aids; the officers never saw Schenck with a bat or any other weapon; when the officers found Schenck, he was hiding under a bus and immediately surrounded by two armed officers; Schenck was attempting to surrender and not actively resisting the officers when he began to crawl out from underneath the bus; Wilt never saw Schenck tuck his hands beneath his body; immediately after Schenck said "okay" and complied with the officers' commands to come out from underneath the bus, Wilt began to strike Schenck's back; there was no basis for the officers to feel threatened by Schenck, as it did not appear that Schenck was trying to hit, kick, or in any way resist the officers; Schenck was trying to protect himself – not resist – when Flores deployed the taser in drive-stun

mode on Schenck's lower back three times in short succession, and when Wilt struck him repeatedly on his back, face, and head with a closed fist; Schenck verbalized an intent to surrender at least four times during the encounter, yet the officers continued to beat him, including by hitting him in the head with the butt of the taser; the officers restrained Schenck with his chest on the ground while applying pressure to his back and ignoring his pleas that he could not breathe; Schenck did not actively resist when he was struggling to stand up following the tasing and the beating; and that Schenck was already subdued, helpless, and handcuffed when Watson shoved him into the bus and then a post.  In addition, a reasonable jury could find that the officers did not provide Schenck with proper warning before using this high level of force against him, and that there were other tactics available to effectuate the arrest.

In short, the question whether the officers used excessive force in violation of Schenck's Fourth Amendment rights must be left to the jury.[7]  See, e.g., Longoria, 873 F.3d at 707 ("The record reveals many other facts in dispute that are material to the determination of whether a reasonable officer would have perceived that [plaintiff] posed any immediate threat."); Cameron v. Craig, 713 F.3d 1012, 1022 (9th Cir. 2013) (holding that "[b]ecause historical facts material to the qualified immunity determination are in dispute," defendants were not entitled to summary judgment on qualified immunity grounds) (internal quotation marks omitted).

3.    **Qualified Immunity**.

Having determined that there are disputed factual issues as to whether a constitutional right was violated, the court next turns to the second prong of the qualified immunity analysis.  "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  Mullenix v. Luna, 136 S.Ct. 305, 308 (2015) (per curiam) (internal quotation marks omitted).  In determining whether a right is clearly established, there does not need to be a "case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate."  al-Kidd, 563 U.S. at 741, 131 S.Ct. at

---

[7]  The court "does not hold that a reasonable jury must find in favor of the plaintiff[] on this record, only that it could."  Gonzalez, 747 F.3d at 797.  "The jury could also reasonably find, to the contrary, . . . [that Schenck was violently resisting] and that [the officers] reasonably perceived a threat to their safety sufficient to support" the amount of force used here.  Id.

2083; see District of Columbia v. Wesby, 138 S.Ct. 577, 590 (2018) ("Wesby") ("The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.") (internal quotation marks omitted); Thompson, 885 F.3d at 587 ("For a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate, such that 'every' reasonable official, not just 'a' reasonable official, would have understood that the was violating a clearly established right.") (emphasis and some internal quotation marks omitted). "[T]he dispositive question is whether the violative nature of particular conduct is clearly established." Id.

However, "general statements of the law are not inherently incapable of giving fair and clear warning to officers." White v. Pauly, 137 S.Ct. 548, 552 (2017) (per curiam) (internal quotation marks omitted). In some circumstances, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." United States v. Lanier, 520 U.S. 259, 271, 117 S.Ct. 1219, 1227 (1997) (internal quotation marks omitted); see Wesby, 138 S.Ct. at 581 ("[T]here can be the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances.") (internal quotation marks and citations omitted). The court is "particularly mindful of this principle in the Fourth Amendment context, where the constitutional standard – reasonableness – is inevitably a fact-intensive inquiry. After all, if qualified immunity provided a shield in all novel factual circumstances, officials would rarely, if ever, be held accountable for their reasonable violations of the Fourth Amendment." Bonivert v. City of Clarkson, 883 F.3d 865, 872-73 (9th Cir. 2018) (internal quotation marks and brackets omitted).

The court is cognizant of the Supreme Court's recent admonition that Graham does not, "by [itself] create clearly established law outside the obvious case." White, 137 S.Ct. at 552. However, in this case, viewing the evidence in the light most favorable to plaintiff, it is obvious that defendants used considerable and extensive force against plaintiff that was unwarranted by the circumstances facing defendants. When the officers arrived, the scene they observed undermined the description of the crime relayed to them by Dispatch. Specifically, they did not see the suspect

with any bat or other weapon, the only person injured had minor injuries later treated with band-aids, and there was no big rig on fire.  Moreover, when defendants found the suspect, he was hiding under a bus and immediately surrounded by two armed officers.   Under these circumstances, viewing the facts in the light most favorable to plaintiff, no reasonable officer would believe that it was lawful to: without proper warning, use force against a suspect who was neither threatening nor actively resisting the officers, and who had verbalized an intent to surrender, seconds after the suspect had shown the officers his hands and was attempting to crawl out from under the bus in an effort to surrender; deliver three to four closed fist strikes to the suspect's back, 15 successive closed fist strikes to his face and head, and three rapid taser drive-stun deployments to his back; hit the suspect in the head with the butt of a taser; restrain the suspect with his chest on the ground while applying pressure to the suspect's back and ignoring his pleas that he could not breathe; force the weakened, dazed, handcuffed, and non-resisting suspect to his feet and then slam him into a bus and then a post.  In short, viewing the evidence in the light most favorable to plaintiff, it is obvious that Schenck posed no immediate threat to the safety of the officers or others and that the officers used excessive force against Schenck.  See Hope v. Pelzer, 536 U.S. 730, 738, 122 S. Ct. 2508, 2514-15 (2002) ("As the facts are alleged by [plaintiff], the [Fourth] Amendment violation is obvious."); see, e.g., Estate of Kosakoff ex rel. Kosakoff v. City of San Diego, 460 F.Appx. 652, 654 (9th Cir. 2011) ("Kosakoff") (affirming denial of qualified immunity on excessive force claim because, if jury were to find plaintiff "posed no significant threat[,]" fact that deadly force employed by officers was unconstitutionally excessive would be "obvious as a matter of law") (internal quotation marks omitted); Adams v. Speers, 473 F.3d 989, 994 (9th Cir. 2007) (affirming qualified immunity denial where, "accepting [plaintiff's] facts as true, this case falls within the obvious"); Kosakoff v. City of San Diego, 2010 WL 1759455, *9 (S.D. Cal. 2010), aff'd, 460 F.Appx. 652 (9th Cir. 2011) (denying qualified immunity on excessive force claim based on finding that this was an "obvious case" where: "(1) there was no indication that Alan was armed, (2) he was not physically resisting arrest and was not verbally confrontational with the officers, (3) there is a dispute as to what verbal commands were given to him by the officers and whether those commands could be heard over all the commotion, (4) his car was slowly backing

out of his mother's garage and away from the officers, and (5) there was no reason to believe that he any longer posed danger to the officers or anyone else"); see also Abraham v. Rasso, 183 F.3d 279, 293 (3d Cir. 1999) ("A passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect.").

In addition to this being an obvious violation, factually similar case law provided defendants clear notice that their conduct violated the Fourth Amendment.  For example, a body of case law makes clear that beatings, tasings, and other such uses of force against individuals who pose little risk to officer safety and offer minimal or no resistance violates an individual's Fourth Amendment right to be free of excessive force.  In Blankenhorn v. City of Orange, 485 F.3d 463 (9th Cir. 2007), the Ninth Circuit held that, even though the suspect, unlike in the instant case, refused to comply with the officer's request that he kneel down, "a rational jury – drawing all reasonable inferences from the facts alleged – could conclude the [officer's] gang tackle [of the plaintiff] was unreasonable[,]" where "the severity of the alleged crime . . . was minimal," and the suspect "did not pose a serious threat to the officers' or others' safety" and was not actively resisting arrest. See id. at 478-79.  The Blankenhorn court concluded that a rational jury could find that the officer's punches of the plaintiff were unjustified, noting that, though the plaintiff had "initially resisted being arrested" and that the officer had testified that his punches were an effort "to get [the plaintiff's] arms out from underneath him and secure the handcuffs[,]" the plaintiff had testified that "he never pinned his arms underneath his body[.]"  Id. at 480 (internal quotation marks omitted); see, e.g. Davis, 478 F.3d at 1052 & 1057 (holding that officer's conduct violated clearly established law where the officer pushed handcuffed man into a wall multiple times and punched him in the face while he was on the ground, noting that, although arrestee had been trespassing and had obstructed the officer, he was unarmed, in handcuffs, and never attempted to harm the officer). Similarly, in Young v. Cty. of Los Angeles, 655 F.3d 1156 (9th Cir. 2011), the court held that, as of 2007, "well-established principles of Fourth Amendment law sufficed to put [officer] on notice that the force used was excessive – that to pepper spray an individual and strike him with a baton for disobeying a traffic officer's order to get back in his car . . . constituted a violation of the Fourth Amendment[.]"  Id. at 1168; see Redmond v. San Jose Police Dep't, 2017 WL 5495977, *21 (N.D.

Cal. 2017) ("Long before 2013, [Graham, Blankenhorn, and Young], made clear to a reasonable officer that using force (including punching) against a suspect who did not commit a serious crime, did not pose a threat, and did not resist arrest or attempt to flee is objectively unreasonable under the Fourth Amendment."); Santiago v. Hawaii, 2018 WL 340027, *4 (D. Haw. 2018) (denying qualified immunity in excessive force case where officer "employed more than minimal force where even minimal force was not required").

In LaLonde v. Cty. of Riverside, 204 F.3d 947 (9th Cir. 2000), plaintiff challenged the force used to arrest him, which included (1) pepper spraying his face; (2) using unnecessarily tight handcuffs; and (3) pinning him to the ground with a knee, which he claimed seriously injured his back. Id. at 959-61. In denying qualified immunity, the Ninth Circuit noted that the plaintiff was being arrested for relatively minor offenses; that, although he initially resisted arrest, plaintiff testified that he stopped resisting before the officer's knee was placed on his back; and that, even if he was resisting at the time his back was injured, the "extent of [his] injury" could lead a reasonable jury to conclude that the officer used force "in excess of what was reasonable." Id. at 959. Although LaLonde challenged the use of pepper spray, the court grounded its analysis in an analogy to excessive force cases involving canines, stating as follows:

> '[N]o particularized case law is necessary for a deputy to know that excessive
> force has been used when a deputy sics a canine on a handcuffed arrestee
> who has fully surrendered and is completely under control.' . . . The same
> principle is applicable to the use of pepper spray as a weapon: the use of
> such weapons (e.g., pepper sprays; police dogs) may be reasonable as a
> general policy to bring an arrestee under control, but in a situation in which
> an arrestee surrenders and is rendered helpless, any reasonable officer
> would know that a continued use of the weapon or a refusal without cause
> to alleviate its harmful effects constitutes excessive force.

Id. at 961 (quoting Mendoza v. Block, 27 F.3d 1357, 1362 (9th Cir. 1994)). The LaLonde court cited Watkins v. City of Oakland, 145 F.3d 1087 (9th Cir. 1998), where the Ninth Circuit affirmed the district court's denial of qualified immunity on an excessive force claim that challenged the

duration and extent of force applied in arresting a suspected burglar.  Id. at 1090.  In Watkins,  the officer allowed a police dog to continue to bite the suspect even when the suspect was "obviously helpless and surrounded by police officers" because the suspect was not complying with the officer's commands to show his hands to prove that he was unarmed, as he was recoiling from the pain of the attack.  Id.

It is also clearly established law that pressing weight onto the back of a prone and helpless arrestee, particularly as he begs for air, constitutes excessive force.  In Drummond ex rel. Drummond v. Anaheim, 343 F.3d 1052 (9th Cir. 2003), cert. denied, 542 U.S. 918 (2004),  multiple officers were attempting to take into custody an unarmed individual who was hallucinating and in an agitated state.  One officer "knock[ed] Drummond to the ground [,] where the officers cuffed his arms behind his back as Mr. Drummond lay on his stomach.  Although Drummond offered no resistance, [another officer] put his knees into Mr. Drummond's back and placed the weight of his body on him. [The first officer] also put his knees and placed the weight of his body on him, except that he had one knee on Mr. Drummond's neck."  Id. at 1054 (internal citation marks omitted).  The Ninth Circuit held that any reasonable officer should have known that crushing an unresisting arrestee against the ground by pressing the officer's weight on the suspect's neck and torso while he "begged for air" constituted excessive force.  See id. at 1059-60 (internal alternations and quotation marks omitted).

In Abston v. Merced, 506 F.Appx. 650 (9th Cir. 2013), the Ninth Circuit considered another situation in which officers used body compression as a means of restraint.  See id. at 652-53.  In that case, the officers had warned the decedent – who had been driving the wrong way through traffic while high on methamphetamine – to stop running away or they would tase him.  Id. at 651.  When he continued running away, the officers twice deployed a taser in dart mode and then, when the decedent was face-down on the ground, the officers applied pressure on his back for about a minute.  Id.  The court denied qualified immunity, holding that "[a] reasonable fact-finder could conclude that defendants' use of body compression as a means of restraint was unreasonable and unjustified" and that "[i]t was clearly established that defendants' use of body compression to restrain a prone and bound suspect, who was in no position to offer any meaningful resistance,

1   would violate the rule established by <u>Drummond</u> nearly five years earlier[.]" <u>Id.</u>; <u>see</u>, <u>e.g.</u>, <u>Arce v.</u>

2   <u>Blackwell</u>, 294 F.Appx. 259, 260-61 (9th Cir. 2008) (holding that keeping arrestee restrained with

3   his chest to the ground while applying pressure to his back and ignoring pleas that he could not

4   breathe was unconstitutionally excessive force).  The court also noted that a reasonable jury could

5   find that even if the decedent resisted, the resistance was not "anything more than minimal[,]"

6   which would "bring[] defendants' conduct within <u>Drummond</u>."  <u>Id.</u> at 653.

7        The law was also clearly established at the time of the underlying incident in this case that

8   the rapid, repeated use of a taser to apprehend a suspect who did not appear to have a weapon,

9   and was neither a flight risk nor an immediate threat because he was surrounded by officers, and

10  was not making any threatening gestures, is unlawful.  For example, in <u>Jones v. Las Vegas Metro.</u>

11  <u>Police Dep't</u>, 873 F.3d 1123 (9th Cir. 2017), the parents of an individual who died as a result of

12  his encounter with the police challenged the officers' repeated use of a taser against him, where

13  one officer testified that it "didn't look like [the decedent] was resisting" and there were "enough

14  officers" to take him into custody.  <u>Id.</u> at 1127.  The Ninth Circuit denied qualified immunity, holding

15  that, in 2010, when the incident in question occurred, "[a]ny reasonable officer would have known

16  that [continuous, repeated taser use] can only be justified by an immediate or significant risk of

17  serious injury or death to officers or the public[.]"[8]  <u>Id.</u> at 1132.  More recently, in <u>Bonivert</u>, the

18  Ninth Circuit, in holding that genuine issues of fact precluded qualified immunity on an excessive

19  force claim, stated that it was clearly established by <u>Mattos</u> in 2011 that deploying a taser in drive-

20  stun mode several times on a suspect who posed no immediate threat to officers and was not

21  resisting arrest constituted excessive force.  <u>See</u> 883 F.3d at 879-81; <u>Mattos</u>, 661 F.3d at 443

22  (holding that deploying taser in drive-stun mode three times in rapid succession against

23  unresisting detainee was excessive, noting "the magnitude of the electric shock at issue and the

24  extreme pain that Brooks experienced"); <u>Bryan</u>,630 F.3d at 826 (holding that, as of 2005, firing a

25  taser "in dart-mode constitute[d] an intermediate, significant level of force that must be justified by

26
27        [8]  To the extent the court relies on any cases decided after the underlying incident, it is to
     indicate that the clearly established law analysis here is in line with circuit precedent that found
     clearly established law for similar conduct that occurred prior to the underlying incident here, <u>i.e.</u>,
28   on or before May 28, 2016.

the governmental interest involved"); see, e.g., Ledesma v. City of Vallejo, 2019 WL 932019, *6 (E.D. Cal. 2019) (denying qualified immunity on excessive force claim where, under plaintiffs' version of facts, officers responding to domestic dispute ordered plaintiff out of his vehicle and the officer pointed a gun at plaintiff when plaintiff did not exit immediately, the officers tased plaintiff's dog and then tased plaintiff from behind and began to hit him numerous times with a baton as he used his arms to protect his head from the officer's blows).

Inevitably, there are factual differences between the foregoing cases and the instant case, but the Supreme Court has instructed that a plaintiff need not identify "a case directly on point" for a right to be clearly established. See White, 137 S.Ct. at 551. In light of the foregoing cases, and taking the facts in the light most favorable to plaintiff, the court is persuaded that existing precedent "placed the statutory or constitutional question beyond debate[.]"[9] Mullenix, 136 S.Ct. at 308 (internal quotation marks omitted). Considering the totality of the circumstances, see Bryan, 630 F.3d at 826, there is more than sufficient clearly established law that "prohibit[s] [the officers'] actions in this case[.]" City of Escondido v. Emmons, 139 S.Ct. 500, 503-04 (2019). Defendants are not entitled to qualified immunity on plaintiff's excessive force claim.

/ / /

/ / /

---

[9]   Defendants assert that prior case law, specifically, Marquez v. City of Phoenix, 693 F.3d 1167 (9th Cir. 2012), and Gonzalez v. City of Anaheim, 715 F.3d 766 (9th Cir. 2013) ("Gonzalez I"), "clearly establishes that the deputies' actions were reasonable." (Dkt. 101, Joint Br. at 41-42) (emphasis omitted). Defendants' assertions are unpersuasive. First, Gonzalez I cannot clearly establish any law because that decision was reheard en banc and, therefore, Gonzalez I can "not be cited as precedent by or to any court of the Ninth Circuit." Gonzalez v. City of Anaheim, 733 F.3d 979, 980 (9th Cir. 2013). Second, as for Marquez, that case is too dissimilar on its facts. In Marquez, before deploying a taser nine times and wrestling a suspect to the ground, the officers "were greeted by a blood-spattered room, an injured adult, and a child in evident distress[.]" 715 F.3d at 1175. Further, the suspect – "who was warned that he would be 'tased' if he did not comply – was also actively resisting arrest[,]" by attempting to kick the officers. Id. Under the circumstances in Marquez, the officers could reasonably have thought the suspect posed an immediate risk to the "injured adult," who was naked in the corner screaming, with her face showing evidence of a recent beating. See id. at 1171 & 1175.

B.     Due Process Claims.

Defendants seek summary judgment with respect to plaintiff's claims for right to familial relationship and denial of medical care.[10]  (See Dkt. 101, Joint Br. at 45-47).

1.     **Right to Familial Relationship**.

Children have a Fourteenth Amendment liberty interest in their familial relationship with their parents.  See Hayes v. Cty. of San Diego, 736 F.3d 1223,1229-30 (9th Cir. 2013); Curnow v. Ridgecrest Police, 952 F.2d 321, 325 (9th Cir. 1991), cert. denied, 506 U.S. 972 (1992); see also Rosenbaum v. Washoe Cty., 663 F.3d 1071, 1079 (9th Cir. 2011) ("[T]he substantive due process right to family integrity or to familial association is well established[.]").  "Official conduct that shocks the conscience in depriving [children] of that interest is cognizable as a violation of due process."  Wilkinson v. Torres, 610 F.3d 546, 554 (9th Cir. 2010), cert. denied, 562 U.S. 1219 (2011) (internal quotation marks omitted).  "Depending on the circumstances, plaintiffs may establish a Fourteenth Amendment violation by showing that the officers 'acted with deliberate indifference' or by showing that they 'acted with a purpose to harm' the suspect."  Kosakoff, 460 F.Appx. at 654-55 (quoting Porter v. Osborn, 546 F.3d 1131, 1137 (9th Cir. 2008) ("Porter I")) (emphasis omitted).  "Where actual deliberation is practical, then an officer's deliberate indifference may suffice to shock the conscience.  On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives."  Wilkinson, 610 F.3d at 554 (internal quotation marks and citations omitted).

"The purpose to harm standard is a subjective standard of culpability."  A.D. v. Cal. Highway Patrol, 712 F.3d 446, 453 (9th Cir.), cert. denied, 571 U.S. 1006 (2013).  Specifically, "[i]t is the intent to inflict force beyond that which is required by a legitimate law enforcement objective that 'shocks the conscience' and gives rise to liability under § 1983[.]"  Porter I, 546 F.3d at 1140.  Whether police officers acted with a purpose to harm "implicates precisely the same delicate balancing act between citizens' rights to be free from undue police force and the legitimate safety

_____

[10]  Defendants did not raise qualified immunity with respect to plaintiff's due process claims. (See, generally, Dkt. 101, Joint Br. at 45-47).

concerns of officers who make these life and death decisions[.]" Id. at 1141; see Lewis, 523 U.S. at 850, 118 S.Ct. at 1719 (denial of due process "is to be tested by an appraisal of the totality of facts in a given case") (internal quotation marks omitted).   "A 'purpose to harm' may be established by evidence of (1) an intention to 'induce lawlessness, or to terrorize, cause harm, or kill'; (2) force being used against a suspect to 'teach him a lesson' or to 'get even'; or (3) an officer engaging in 'particularly objectionable conduct.'" Porter v. Osborn, 2009 WL 5068632, *7 (D. Alaska 2009) ("Porter II") (quoting Porter I, 546 F.3d at 1140).

Defendants contend that plaintiff's interference with familial relationship claim fails because "the deputies were required to make split-second decisions and actual deliberation was not practical . . . [n]or is there evidence that the deputies acted with a purpose to harm decedent for reasons unrelated to legitimate law enforcement objectives." (Dkt. 101, Joint Br. at 45).   The court is not persuaded.

As an initial matter, the court "need not determine [whether the deliberate indifference or purpose to harm standard] applies here, because a reasonable jury could conclude that [the officers] violated the Fourteenth Amendment even under the more stringent purpose-to-harm standard." Kosakoff, 460 F.Appx. at 654.   As described in connection with the excessive force claim, the governmental interests in using force against Schenck were minimal.   See supra at § I.A.2. When the officers approached Schenck, he was stationary and lying face down under a bus, surrounded by two officers with guns drawn.   (See Dkt. 101, SUF at D23 & D27; Dkt. 101-3, Dispatch at 15:00; Dkt. 101-4, Call Log at ECF 1932; Dkt. 101-5, Flores Depo. at 109-12; Dkt. 101-7, Wilt Depo. at ECF 34; Dkt. 101-20, Flores St. at ECF 2308; Dkt. 101-21, Wilt St. at ECF 2325).   Given Wilt's testimony that he did not believe that Schenck was trying to hit or attack the officers, a reasonable jury could infer that the officers did not feel threatened.   (Dkt. 101-21, Wilt St. at ECF 2327 & 2329; see Dkt. 101-7, Wilt Depo. at 58-60 & 63-64).   Yet, as Schenck attempted to surrender by crawling out from under the bus, the officers began to repeatedly tase and strike Schenck on the head and back, even as he cried out in pain and offered to surrender. Then, after Schenck was handcuffed, subdued, and helpless, defendants continued to use force against him, by pushing him against a bus and a post and applying body compression to

Schenck's back.  See supra at § I.A.2.  Such "action[s] . . . could be viewed as punishing or harassing[,]" and even "extraordinary[,]" Porter I, 546 F.3d at 1142, particularly in light of the officers' training that keeping a subject in a prone, face-down position with the weight of an officer on the subject's back creates a substantial risk of asphyxiation that expands as time goes on. (See Dkt. 101-19, Exh. 17, Deposition of Roger Clark ("Clark Depo.") at 57; Dkt. 101-21, Wilt St. at ECF 2322; Dkt. 101-20, Flores St. at ECF 2313).

While those facts alone are sufficient to raise issues of material fact with respect to this claim, there is also the crude, sadistic language the officers directed at Schenck throughout the incident, from the moment Flores saw Schenck under the bus and Wilt yelled, "Fucking pop him!" (Dkt. 101-8, Wilt Audio at 00:24-00:35).  Defendants' statements during the incident could lead a reasonable jury to conclude that the officers wanted to "get even" or teach Schenck a lesson for attempting to flee the scene.  See Porter II, 2009 WL 5068632, at *7.  "Law enforcement officers involved in an escalating situation are capable of experiencing a full range of human emotion, and it may reasonably be said that [the officers] could have developed an improper 'purpose to harm' of the sort mentioned above during the course of the incident. In short, [the officers'] 'purpose' when [they used force against Schenck] remains in dispute."  Id.

In sum, there is a triable issue of fact as to whether the officers had a purpose to harm Schenck "unrelated to legitimate law enforcement objectives."  Wilkinson, 610 F.3d at 554; see, e.g., Barragan v. City of Eureka, 2016 WL 4549130, *5 (N.D. Cal. 2016) ("[I]f the jury believes that McClain was not reaching for his waistband and/or was not dropping his hands, then . . . [it] could conclude that in even within those few seconds Linfoot had a purpose to harm McClain."); Kaur, 23 F.Supp.3d at 972-73 ("A jury could find the Officer Defendants had such an illegitimate purpose [i.e., purpose to harm] if that jury concludes the Officer Defendants shot a non-dangerous, non-fleeing, possibly mentally ill, suspected misdemeanant numerous times after that person may have said "don't shoot.").

2.    **Failure to Render Medical Care**.

The Fourteenth Amendment protects a detainee who has not been charged or convicted of a crime from the denial, delay, or intentional interference with their receipt of adequate medical

care.  See Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002).  "[E]ven though pretrial detainees [sic] claims arise under the due process clause [of the Fourteenth Amendment], the [E]ighth [A]mendment guarantees provide a minimum standard of care for determining rights as a pretrial detainee, including rights . . . to medical care."  Carnell v. Grimm, 74 F.3d 977, 979 (9th Cir. 1996), abrogated on other grounds by Castro v. Cty of Los Angeles, 833 F.3d 1060 (9th Cir. 2016) (en banc) (internal quotation marks omitted).  "[C]laims for violations of the right to adequate medical care brought by pretrial detainees against individual defendants under the Fourteenth Amendment must be evaluated under an objective deliberate indifference standard."  Gordon v. Cty. of Orange, 888 F.3d 1118, 1124-25 (9th Cir. 2018), cert. denied, 2019 WL 113108 (2019).  "There is no separate inquiry into an officer's subjective state of mind."  Horton by Horton v. Santa Maria, 915 F.3d 592, 602 (9th Cir. 2019).  However, the "'mere lack of due care by a state official' does not deprive an individual of life, liberty, or property under the Fourteenth Amendment."  Castro, 883 F.3d at 1071 (quoting Daniels v. Williams, 474 U.S. 327, 330-31, 106 S.Ct. at 664); Gordon, 888 F.3d at 1125 (same).   "[T]he plaintiff must 'prove more than negligence but less than subjective intent – something akin to reckless disregard.'"  Gordon, 888 F.3d at 1125 (quoting Castro, 833 F.3d at 1070); see Jett v. Penner, 439 F.3d 1091, 1095 (9th Cir. 2006) ("Indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care.").

Defendants argue that plaintiff's "claim of failure to render/denial of medical care . . . fails because she cannot point to any evidence that the deputies were deliberately indifferent to decedent's medical needs."  (Dkt. 101, Joint Br. at 46).

"The denial of medical care in the face of an obvious emergency constitutes deliberate indifference."  Lopez v. Swaney, 741 F.Appx. 486, 487 (9th Cir. 2018); see also Farmer v. Brennan, 511 U.S. 825, 842, 114 S.Ct. 1970, 1981 (1994) ("[A] prison official who was unaware of a substantial risk of harm to an inmate may nevertheless be held liable under the Eighth Amendment if the risk was obvious and a reasonable prison official would have noticed it."); Hunt v. Dental Dep't, 865 F.2d 198, 201 (9th Cir. 1989) (holding that it is beyond debate that prison official acts with deliberate indifference when official denies medical care to prisoner exhibiting

serious symptoms of pain or disease).  Here, plaintiff has presented evidence that, following the beating by defendants, Schenck was suffering from "an obvious medical emergency."  Lopez, 741 F.Appx. at 487.  On the audiotape, Schenck can be heard crying out in pain, (see Dkt. 101-8, Wilt Audio at 0:55), and telling the officers for over a minute that he can't breathe while the officers are apparently holding him in a prone position.  (See Dkt. 101-1, SUF at P40; Dkt. 101-8, Wilt Audio at 1:43-2:40).  There is also evidence that Wilt observed Schenck looking dazed after the officers rolled him over and forced him to stand.  (See Dkt. 101-1, SUF at P48; Dkt. 101-21, Wilt St. at ECF 2324), and that the officers forced a dazed and helpless Schenck to walk to the patrol car, demanding that he get up even after he kept collapsing, (see Dkt. 101-8, Wilt Audio at 3:00-5:25; Dkt. 101-21, Wilt St. at ECF 2323; Dkt. 101-6, Watson Depo. at 35-56 & 45; Dkt. 101-20, Flores St. at ECF 2317-19).  In other words, viewing the evidence in the light most favorable to plaintiff, Schenck exhibited "clearly observable and severe symptoms" that he was suffering from a medical emergency.  See Lopez, 741 F.Appx. at 487.

In addition, "some evidence suggests that the officers' response to Plaintiff's needs," i.e., forcing Schenck to walk to the patrol car rather than seek immediate medical attention, was deliberately indifferent.[11]  See Lopez, 741 F.Appx. at 487.  As the Ninth Circuit has explained in the prison context, "[t]he more basic the particular need, the shorter the time it can be withheld. It is doubtful, for example, that any circumstance would permit a denial of access to emergency medical care."  Hoptowit v. Ray, 682 F.2d 1237, 1259 (9th Cir. 1982), abrogated on other grounds by Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293 (1995).  Here, plaintiff presented evidence that, for several crucial minutes, defendants "observed [him] suffering from grave symptoms and did nothing to obtain help for [him]."  Lopez, 741 F.Appx. at 487.  Delays of even a few minutes

---

[11]  To the extent defendants argue that they could not have safely or reasonably called for help sooner because they heard an "aggressive" dog barking nearby, (see Dkt. 101, Joint Br. at 47) (arguing that deputies called for help "almost immediately after getting the [sic] Schenck to safety and out of the backyard") (emphasis omitted), that argument is unpersuasive.  There is no evidence that the dog approached the officers, let alone any evidence as to where the dog was located.  (See Dkt. 101-1, SUF at P56; Dkt. 101-20, Flores St. at ECF 2318).  Nor is there evidence as to whether or how the dog made it unsafe for the officers to keep Schenck in place near the bus – instead of forcing him to walk to the patrol car – and call for medical help immediately.  (See, generally, Dkt. 101-1, SUF).

1  in seeking care for life-threatening injuries can constitute deliberate indifference.  See, e.g.,

2  Valderrama v. Rousseau, 780 F.3d 1108, 1117 & 1121-23 (11th Cir. 2015) (finding, where officers

3  did not "provide[] any explanation supported by the record why three and a half minutes passed

4  before [one officer] called an ambulance," that plaintiff raised triable issue of fact as to whether the

5  officers' delay in seeking medical attention for arrestee who was suffering from gunshot wound

6  could constitute deliberate indifference") (internal quotation marks omitted).

7         In sum, the evidence plaintiff has presented  could establish that  there was "a substantial

8  risk of serious harm to [Schenck] that could have been eliminated through reasonable and

9  available measures that the officer[s] did not take[.]"  Castro, 833 F.3d at 1070; see Lopez, 741

10  F.Appx. at 487; Hoptowit, 682 F.2d at 1259; Valderrama, 780 F.3d at 1121-23.

11  II.    STATE CLAIMS.

12         Defendants argue that plaintiff's state law claims fail as a matter of law because "there are

13  no triable issues that Defendants were negligent, committed actionable battery and assault, or

14  intentionally inflicted emotional distress upon Plaintiff."  (See Dkt. 101, Joint Br. at 49).

15  Defendants' arguments are unpersuasive.

16         A.    Negligence, Assault/Battery, & Intentional Infliction of Emotional Distress Claims.

17         "Except when otherwise provided by law, public employees in California are statutorily liable

18  to the same extent as private persons for injuries caused by their acts or omissions, subject to the

19  same defenses available to private persons."  Hayes v. Cty. of San Diego, 57 Cal.4th 622, 628-29

20  (2013) (citing Cal. Gov't Code § 820).  "[T]o prove facts sufficient to support a finding of

21  negligence, a plaintiff must show that defendant had a duty to use due care, that he breached that

22  duty, and that the breach was the proximate or legal cause of the resulting injury."  Id. at 629.  The

23  California Supreme Court "has long recognized that peace officers have a duty to act reasonably

24  when using deadly force."  Id.  "Law enforcement personnel's tactical conduct and decisions

25  preceding the use of deadly force are relevant considerations under California law in determining

26  whether the use of deadly force gives rise to negligence liability."  Id. at 639.  "Such liability can

27  arise, for example, if the tactical conduct and decisions show, as part of the totality of the

28  circumstances, that the use of deadly force was unreasonable."  Id.

1
2
3

"A state law battery claim is a counterpart to a federal claim of excessive use of force.  In both, a plaintiff must prove that the peace officer's use of force was unreasonable."  Brown v. Ransweiler, 171 Cal.App.4th 516, 527 (2009).

4
5
6
7
8
9
10
11
12
13
14
15
16
17

Given that the court has already determined that there are triable issues of fact as to whether the force used against Schenck was reasonable, see supra at § I.A.2., summary judgment is denied as to plaintiff's negligence, assault/battery, and intentional infliction of emotional distress claims.  See Vos, 892 F.3d at 1037-38 ("Because the district court erred in holding that use of deadly force was objectively reasonable under the Fourth Amendment, we reverse its summary adjudication of the Parents' negligence[, assault, battery, and Bane Act claims.]"); C.V. ex rel. Villegas v. City of Anaheim, 823 F.3d 1252, 1257 n. 6 (9th Cir. 2016) (on same reasoning, reversing district court's grant of summary judgment on state law negligence and wrongful death claims, noting "state negligence law . . . is broader than federal Fourth Amendment law") (internal quotation marks omitted); Nelson v. City of Davis, 709 F.Supp.2d 978, 992 (E.D. Cal. 2010), aff'd, 685 F.3d 867 (9th Cir. 2012) ("Because the same standards apply to both state law assault and battery and Section 1983 claims premised on constitutionally prohibited excessive force, the fact that Plaintiff's 1983 claims under the Fourth Amendment survive summary judgment also mandates that the assault and battery claims similarly survive.").

18

B.    Bane Act Claim.

19
20
21
22
23
24
25
26
27

The Bane Act, California Civil Code § 52.1, authorizes a claim for relief against any "person or persons, whether or not acting under color of law, [who] interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state[.]"  Cal. Civ. C. § 52.1(a)-(b).  "The elements of a section 52.1 excessive force claim are essentially identical to those of a § 1983 excessive force claim."  Knapps v. City of Oakland, 647 F.Supp.2d 1129, 1168 (N.D. Cal. 2009); Gomez v. City of Fremont, 730 F.Supp.2d 1056, 1068 (N.D. Cal. 2010) (same).  Accordingly, because defendants are not entitled to summary judgment on plaintiff's § 1983

28

1   excessive force claim, they are not entitled to summary judgment on plaintiff's Bane Act claim.[12]

2   See Burns v. City of Redwood City, 737 F.Supp.2d 1047, 1065 (N.D. Cal. 2010) ("Because the

3   federal [excessive force] claim has survived [the] motion [for summary judgment], so too must the

4   state [Bane Act] claim survive."); Bailey v. Cty. of San Joaquin, 671 F.Supp.2d 1167, 1179 (E.D.

5   Cal. 2009) ("California courts have held that Section 52.1 claims are viable when plaintiff has a

6   claim for excessive force by a law enforcement officer.").

7   III.   PUNITIVE DAMAGES.

8           Punitive damages are available in a § 1983 action when a defendant's conduct "is shown

9   to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the

10  federally protected rights of others."   Smith v. Wade, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640

11  (1983); see Dang v. Cross, 422 F.3d 800, 807 (9th Cir. 2005) (same).  A § 1983 punitive damages

12  claim is subject to summary adjudication "where plaintiff fails to produce evidence raising a

13  material question of fact regarding aggravating circumstances or the reckless or callous nature

14  of defendant's actions."   Megargee v. Wittman, 550 F.Supp.2d 1190, 1214 (E.D. Cal. 2008)

15  (internal quotation marks omitted); see Kyle v. Patterson, 196 F.3d 695, 698 (7th Cir. 1999)

16  (same).

17

18          [12] In addition to asserting the arguments the court rejected in the context of plaintiff's excessive
    force claim, defendants argue that "Plaintiff's claim under the Bane Act (Cal. Civ. Code § 52.1)
19  also fails [because] [c]laims under the Bane Act are only actionable by living plaintiffs, and may
    not be asserted on either a survival basis or on recovery for alleged wrongful death."  (Dkt. 101,
20  Joint Br. at 50) (citing Bay Area Rapid Transit Dist. (BART) v. Sup. Ct., 38 Cal.App.4th 141, 145
    (1995) ("BART")).  However, defendants misstate the holding in BART,  which was that "while the
21  Bane Act provides a personal cause of action for a victim of a hate crime, it 'is not a wrongful
    death provision' and 'does not provide derivative liability for the parents of a victim of a hate crime,
22  or for any other persons not present and not witnessing the actionable conduct.'" Medrano v. Kern
    Cty. Sheriff's Officer, 921 F.Supp.2d 1009, 1015-16 (E.D. Cal. 2013) (quoting BART, 38
23  Cal.App.4th at 144).  Here, however, "Plaintiff's Bane Act claim is in the nature of a survival cause
    of action, rather than a wrongful death cause of action." Medrano, 921 F.Supp. at 1016; (see Dkt.
24  43, SAC at ¶¶ 61-65).  "While there appears to be some disagreement . . . as to the effect of
    [BART] . . . on a plaintiff's ability to bring a survival cause of action under the Bane Act on behalf
25  of a decedent,"  the court agrees with the reasoning set forth in Delatorre v. City of Salinas, 2010
    WL 3743762 (N.D. Cal. 2010), and Medrano, that a person's Bane Act claim survives the person's
26  death under California Code of Civil Procedure § 377.20, and thus Schenck's daughter has
    standing to assert a claim on his behalf.  See Delatorre, 2010 WL 3743762, at *7 (collecting
27  cases); Medrano, 921 F.Supp.2d at 1016.

28

As explained above, there are a number of material factual disputes in this case, including: whether Schenck posed an immediate threat to the safety of the officers when they repeatedly tased him and struck his head, face, and back; how long the officer(s) compressed a prone Schenck with their body weight; and to what extent the blows, tasing, and asphyxiation caused Schenck's death.  In addition, it is undisputed that the officers used crude language towards Schenck throughout the encounter, including from the moment Wilt first saw Schenck lying still under the bus and yelled, "You're gonna get shot if you don't show me your fucking hands!" to when the officers attempted to force a collapsing Schenck to walk to the patrol vehicle, yelling "Walk, mother fucker!" and "Get up bitch!"  (See Dkt. 101-8, Wilt Audio at 0:01-0:10, 3:38, 4:12, 4:30, 4:46).  Given the facts presented, a reasonable jury could conclude that defendants engaged in malicious, wanton, or callous conduct.  Thus, summary judgment is denied as to plaintiff's claim for punitive damages.  See, e.g., Megargee, 550 F.Supp.2d at 1214 (denying summary judgment on punitive damages based on material disputes of fact); S.T. ex rel. Niblett v. City of Ceres, 327 F.Supp.3d 1261, 1283-84 (E.D. Cal. 2018) (material issues of fact as to whether decedent posed immediate threat of harm to officers, and whether excessive force was used, precluded grant of summary judgment to officers on punitive damages claim in § 1983 action brought by victim's son).

## CONCLUSION

Based on the foregoing, IT IS ORDERED THAT defendants' Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment **(Document No. 101)** is **denied**. Dated this 20th day of March, 2019.

/s/

Fernando M. Olguin
United States District Judge